IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DONALD A. GIBSON,

        Plaintiff,

        v.                          Civil Action No. 5:06-cv-27

LINDA S. McMAHON,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.    <u>Background</u>

    Plaintiff, Donald A. Gibson, (Claimant), filed his Complaint on March 3, 2006, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on July 13,

2006.[2]   Claimant filed his Motion for Summary Judgment on October 5, 2006.[3]  Commissioner

filed her Motion for Summary Judgment on November 1, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 18.

[4] Docket No. 20.

       2.     <u>Commissioner's Motion for Summary Judgment</u>.

C.     <u>Recommendation</u>

I recommend that:

       1.     Claimant's Motion for Summary Judgment be DENIED.

       2.     Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's credibility and analysis and his determination that work exists in significant numbers in the national economy that Claimant can perform.

## II. Facts

A.     <u>Procedural History</u>

 Claimant filed an application for Supplemental Security Income on November 30, 2003. He filed his application for Social Security Disability Insurance Benefits on February 2, 2004. Claimant alleged disability since September 5, 2003. The application was denied initially and on reconsideration. Claimant requested a hearing before an ALJ, and received a hearing on June 8, 2005. The ALJ issued a decision adverse to Claimant on June 26, 2005. Claimant requested review by the Appeals Council, but it denied this request. Claimant timely filed this action, which proceeded as set forth above.

B.     <u>Personal History</u>

Claimant was 46 years old on the date of the June 8, 2005 hearing before the ALJ. Claimant has a high school education, with limited college experience. Claimant has prior relevant work experience as a laborer and mental health support worker.

C.     <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: September 5, 2003 – June 26, 2005.[5]

**James Weinstein, M.D., 12/5/95, Tr. 112**
Impression: bilateral cervical radiculopathy

**James Weinstein, M.D., 12/5/95, Tr. 115**
Preoperative diagnosis: cervical disk spondylosis, C4-5, C5-6

Postoperative diagnosis: cervical disk spondylosis, C4-5, C5-6

**James Weinstein, M.D., 12/5/95, Tr. 117**
Diagnosis: fibrocartilaginous tissue, consistent with disc

**James Weinstein, M.D., 11/30/95, Tr. 118**
Ord. diagnosis: bulging disc

Impression: normal chest

**R. J. Tallaksen, M.D., 9/25/94, Tr. 123**
Impression of the spine, cervical, unenhanced: disc bulge centrally and to the right at C5-6 with spinal stenosis, mild symmetrical bulge at C4-5.

Impression from MRI of the spine, lumbar, unenhanced: suspect bilateral spondylosis of L5 without spondylolisthesis, mild disc bulge at L4-5.

**R. J. Tallaksen, M.D., 9/20/94, Tr. 124**
Impression of bilateral shoulders: no evidence of fracture

Impression of cervical spine: early degenerative changes at C5-6, narrowing of right neural foramena at C5 and C6.

**James Weinstein, M.D., 7/19/95, Tr. 126**
Impression: mild effacement of the nerve root sleeves at the C5-6 and C6-7 levels on the left and the C4-5 and C5-6 levels on the right. No obvious HNP is present. There may be some narrowing of the AP dimension of the canal at C4-5 and C5-6 from bulging discs.

---

[5] Much of the evidence in the record comes from before Claimant's alleged onset date of disability. Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004).

**James D. Weinstein, M.D., 7/19/95, Tr. 127**
Impression: (1) uncovertebral degenerative changes at C4-5, more on the right, with soft disc herniation (small) causing encroachment of the anterolateral aspect of the thecal sac on the right and impingement of the neural foramen, (2) uncovertebral degenerative changes, mainly on the right at C5-6, causing mild impingement of the thecal sac anterolaterally on the right. This does cause some relative encroachment of the neural foramen.

**James Weinstein, M.D., 4/21/04, Tr. 128**
Impression: degenerative changes and cervical spine with C5-6 ankylosis.

**(Unsigned), 3/9/04, Tr. 130**
Impression: (illegible), GERD, cervical spondylosis

**(Unsigned), 10/8/03, Tr. 134**
Impression: COPD, GERD, URTI

**(Unsigned), 8/19/03, Tr. 135**
Impression: COPD (illegible), GERD

**(Unsigned), 7/28/03, Tr. 137**
Impression: COPD (illegible), back pain, shoulder pain, GERD

**(Unsigned), 6/12/03, Tr. 140**
Impression: COPD (illegible), (illegible), insomnia

**Physical Residual Functional Capacity Assessment, 5/26/04, Tr. 143**
There is insufficient evidence to make any evaluation.

**Russell Biundo, M.D., 8/31/04, Tr. 155**
Can the hand be fully extended? Yes.
Can a fist be made? Yes.
Can the fingers be opposed? Yes.

Upper extremity strength (normal 5/5): 5/5
Grip strength (normal 5/5): 5/5
Fine manipulation: normal

Lower extremity muscle strength (normal 5/5): 5/5

**Physical Residual Functional Capacity Assessment, 9/10/04, Tr. 159**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour work day

Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations
    Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: occasionally
    Climbing ladders/ropes/scaffolds: never

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
    Extreme cold, hazards: avoid concentrated exposure
    Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor
ventilation: unlimited

**Meredith Moss, M.D., 11/9/05, Tr. 199**
Impression: unremarkable ultrasound of the right groin

**Meredith Moss, M.D., 11/9/04, Tr. 200**
Impression: 2.6 cm solid mass at the left chest that could represent a subcutaneous lipoma.

**(Unsigned), 9/14/04, Tr. 201**
Impression: chronic neck pain and cervical disk (illegible), COPD

**James Weinstein, M.D., 8/15/00, Tr. 202**
Ord. diagnosis: neck and right shoulder pain

Impression: uncomplicated cervical myelogram.  No definite defect on plain film myelogram.

Impression: bony spondylosis causing a moderate to severe left neural foraminal narrowing at
C4-5 and moderate right neural foraminal narrowing at C5-6.  Bony spondylosis and a
congenitally narrowed canal causes mild to moderate central canal stenosis at multiple levels.

**James Weinstein, M.D., 9/8/00, Tr. 205**
Ord. diagnosis: neck pain

Impression: no instability on flexion and extension demonstrated

**James Weinstein, M.D., 12/24/02, Tr. 206**
Ord. diagnosis: low back pain, lumbar pain

Impression: mild to moderate degenerative disc changes, although no significant stenosis or
neural encroachment is suspected.  The physician believes there is mild encroachment on the left

L5 in the foramen and clinical correlation is recommended for that.

**James Weinstein, M.D., 1/15/03, Tr. 208**
Ord. diagnosis: neck pain, cervical strain

Impression: (1) mild to moderate spinal canal stenosis at C3-4 and to a lesser extent at C6-7. This is due to degenerative changes in both facet joints at the C3-4 level and to a lesser extent related to a diffuse bulge in addition to degenerative changes at C6-7, (2) straightening of the cervical spine curve, (3) decrease in the height of the C5-6 probably due to extensive degenerative change/previous fusion history, (4) narrowing of the C3-4 neural foramina on the right side.

**James Weinstein, M.D., 4/21/04, Tr. 211**
Impression: stable degenerative changes lower lumbar spine and stable left L5-S1 exit foraminal encroachment.

D.      Testimonial Evidence

        Testimony was taken at the June 8, 2005 hearing.  The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

        Q        Okay.  Do you smoke?

        A        Yes.

        Q        Has any doctor mentioned that to you - -

        A        Yes.

        Q        - - said that's not good?  How much do you smoke?

        A        A pack-and-a-half a day, probably.

                                *               *               *

        Q        Any drugs like marijuana at all?

        A        Yes.

        Q        How often?

6

A       Whenever somebody would give it to me to help me with the pain.  And that's the only drug.

Q       When's the last time, just to give me an idea?

A       Today's Wednesday.  Probably last Thursday, maybe.  Thursday maybe or Friday.

*          *          *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       Okay.  So where do you - - what symptoms do you have with your neck now?

A       Like right now it's hurting so bad I'm sweating and I'm about to get sick.

Q       Where do you have pain?

A       It's just through here.  It comes around my throat, right in my arm.  My arm's just -  my fingers are numb right now.

Q       Okay.

A       It's - -

Q       And you're pointing to kind of the left-hand side of - - left side of your neck, left shoulder.

A       Right now it is, but tonight it might be the right side might be worse [INAUDIBLE].

Q       Okay.  So - -

A       Just - -

Q       - - it's both sides?

A       Oh, yeah.  You don't - - and sometimes when it does it - - when it spasms and

7

whatever it does on both sides, that's just - - I can't explain any more except you can't do anything except get mad clear through. And then the - - I think that makes it worse.

Q      How often does that type of thing happen where you have spasms on both sides?

A      All the time. I mean, pretty constant. It seems to be worse when I move. But when I sit still, I go numb all over. So - -

Q      Okay. Where do you have numbness?

A      My hands and arms.

Q      All of your fingers or just some of them?

A      All of them.

Q      Which hand's worse, your right or your left?

A      Right now the left one is.

Q      Which one do you have symptoms in more often, your right or your - -

A      The left - -

Q      - - left?

A      - - one.

Q      Okay. So - -

A      It's more severe.

Q      - - in your left hand - - how often do you experience numbness in your left hand?

A      All the time.

Q      Do you ever have a time in your left hand in which your - - which you don't have numbness?

A      No. It stays that way now.

Q       Okay.  Are some fingers worse than others?

A       Yeah.  Kind of like the thumb.  And this - -

Q       The thumb and index?

A       Yeah.  These three, probably.

Q       Okay.  Are you talking about the kind of numbness like - - is it totally numb, you don't feel anything?

A       As in dropping things. You know, I'll drop my drink or stuff.  I'll be walking and just drop things.

Q       What about your right hand?  How is it different?

A       It's not as bad.

Q       Not as bad.  Do you mean not as numb or not as often?

A       Not as often.  It doesn't go as numb as my left hand, either.

Q       Okay.  So it kind of - - it comes and goes?

A       Yeah.  More or less.

Q       Are there certain things that will bring that on?

A       If I try to lay down, then I go numb.  It'll go numb every time.  I get - - then - - I mean, I don't know what I do.  But she says I do things in my - -

Q       Okay.

A       - - and I wake up.

Q       Does using your right hand cause any problems?

A       Right - - well, it just depends on how bad it's hurting at the time.  I don't want to go, you know, grabbing 50 pound or 100 pound with it because I don't know what's going to

happen.  I don't - - I'm not worried about my arm.  I'm worried about my neck.

Q      Okay.  How often do you have neck pain?

A      It's - - never stops.

Q      Okay.  Now, the - -

A      It doesn't - -

Q      - - record shows that you have some problems with headaches as well.

A      Yeah.

Q      How often do you have headaches?

A      Those are getting worse.  It used to be just occasionally.  Now it's - - I'm - - they come and go maybe five or six times a day.  And some days maybe I'll have it all day and then I might go three or four days and not have any bad ones.  Just pains shoot through your head and then sometimes it's - - then it turns into a headache sometimes.  And you just don't even want to be awake.

Q      Are you generally able to sleep them off when you get bad headaches?

A      I can't sleep.

Q      Then how do you treat your headaches?

A      You just go with it.  I don't really want to go into it because I ain't - - you know, I get mad sometimes and I - - it's frustrating.

Q      Now you also have some problems with your low back?

A      Yes.

Q      When did those begin?

A      I always did have it kind of like since the - -since I got hurt, but it's gotten a lot

worse in the last few years. It's to the point now where my lower back - - it used to not really be that much of an issue.

Q    Um-hum.

A    Now it's - - now it is.

Q    And when - - you said it's been the last couple years that it's really been an issue?

A    It's really - - yes. It's getting worse.

Q    And where in your low back do you have pain?

A    It's just my whole back. It's - - it seems like my hip - - my left hip. And it's just my whole back.

Q    Is it more on the left side?

A    My left hip hurts like crazy. And in order to keep it from hurting so bad, if I turn my foot out, my left foot, it don't hurt as bad. But it's the right - - the other side that actually hurts worse. The right side of my back actually hurts way worse. And it's swollen now - - all puffed up.

                    *          *          *

Q    I want to talk to you a little bit about what your daily activities are like - - how you spend your day. What time do you go to bed at night?

A    I try to go to bed around 11:00 or 11:30, but it's just all messed up.

Q    Are you able to go to sleep?

A    No. After maybe three days - - probably three or four days, then I might doze for an hour or two. Then I'll get sick. And I'll get so wore out that finally I guess I just collapse because I feel sick and weak. Then I'll sleep four or five hours and wake up and can't move, but

I do feel better, you know, in like my stomach and stuff.

Q      So whenever you're not able to sleep - - you've mentioned a couple times that you get sick.

A      Yeah.  I get sick a lot.

Q      Is that connected with your neck condition or with the pain or is that a totally different problem?

A      I honestly think that this sleep apnea thing and my stomach and everything's got to do with my back because I didn't have these problems before.

Q      What kind of problems are you having with your stomach?  You've mentioned it several times now.

A      Well, I'm passing blood pretty consistently, especially when I'm upset.  I know I have IBS.  Dr. Pawn's [phonetic] already diagnosed me with that.  And I've been checked for - - I have some stomach trouble.  But the pain - - you know, I might sit down and eat some spaghetti and it might not hurt me at all.  And then the next day, you know, something like chicken, which I eat tons of, might just tear me up and it's something that usually don't or - - you just don't know.

Q      Is it in any way connected to how bad you're hurting that day?

A      I just think my back makes me sick and it causes all that.  But I don't - - I'm not a doctor.  I don't - - I really - - I don't know why.

Q      Okay.  So - -

A      If I could sleep I think my stomach would feel better.  But I don't know how that's ever going to happen.

Q        Why can't you sleep?

A        I just can't.  It just hurts.  And when I doze off when I'm tired, I wake up.  I mean, she can explain it better than I can because she's awake.

Q        Um-hum.

A        And I just - - as dumb as it sounds, I just wake up and I get up.  She'll rub my back.  I'll doze back off.  And I don't know.  Maybe, what, 15, 20 minutes later I'm back awake again.  And finally just to keep from bothering her I just get up.  You just can't keep doing that.  I mean, she's actually massaged my shoulders so much that they became raw - - almost bloody raw and you couldn't even touch them - - only to put lotions on them.  That's how bad that I've had her to just dig and claw.  And then she don't want to do that.  That's only - - that's my relief, those few minutes.  That's my relief.

Q        All right.  So let's say in an average week, how many nights out of that week will you get a total of four or more hours sleep?

A        None.

Q        How much sleep do you typically get in the night?

A        Maybe two, on an average.  If you average it all out - -

Q        Um-hum.

A        - - it's two, three, if you average it all out, maybe.  But that's never straight through.

Q        All right.  So what time do you generally get up in the morning for good?

A        Oh, about 5:00.  I'm usually already up.  I mean - -

Q        All right.  But - -

A        - - it seems like I'm always up.

Q        - - I mean, what time do you get up to start your day?  Get up and get a shower - -

A        I used to - -

Q        - - and get dressed.  Those sorts - -

A        - - get up around - -

Q        - - of things.

A        I used to get up at 5:00.  I didn't even need an alarm clock.

Q        What about now?

A        I really don't have any time.  Whenever I can pass out, I do, for a little bit.  And

then I get up, you know.  Even my doctor - - sleep apnea doctor told me - - he says when you

feel tired, lay down and get what rest you can.  He said don't stay up and try to stay up to make it

night, because your - - it's not going to work with you.  He said just get rest when you can.

That's - -

Q        Okay.   So during the daytime hours, do you sleep some?

A        Every now and then I'll doze - - take a nap.  I'll get a nap.  Just where I'm tired.

Q        So during  the daytime hours - - let's say - - first, let's say from 8:00 to 5:00, a

normal working day.  How much time do you spend lying down or sleeping, total?

A        In an eight-hour working day?

Q        Right.  Let's - -from 8:00 to 5:00.

A        Lying down or sleeping?

Q        Um-hum.

A        Maybe an hour a day.  But lying down, I couldn't tell you exactly.  But I got to do

it a lot.  I'll lay down, then I'll sit up, then I'll walk, then I'll sit up, then I'll lay down, and then I'll go right side, left side, up.  And that is my day.  Get - - my day is getting through the day.

Q        Typically then, how long are you able to do - - to stay in one of those positions?  Like, how long do you sit and then how long can you stand and how long - -

A        Well, I've been in this - -

Q        - - do you lay?

A        - - I've been in this one too long.  I can tell you that.

OBS        Never more than 15 minutes.

CLMT        No - -

ALJ        She can't - -

ATTY        Okay.

ALJ        - - she can't - -

ATTY        Yeah.

ALJ        - - testify.

ATTY        You're going to have to answer for me.

CLMT        That's probably - - that's correct.

BY ATTORNEY:

Q        Okay.  So sitting.  How long usually are you able to sit?  Can you watch a half-hour?

A        I can sit - -

Q        - - TV show?

A        - - a little bit better than I can - - I can't hardly lay.  I can sit a little bit better than

15

I can do anything.  I like to stand.  And I used to walk and it used to feel good, but it don't anymore.  It feels like somebody's took a bit rope and tied it around my back and is just making big knots in it.

Q        Okay.  On a normal day, how long are you able to sit at a time in a straight chair with your feet on the floor.

A        Maybe 10 minutes, 15 minutes.

Q        What about standing?

A        If I wasn't here I wouldn't be here sitting here this long.  I know that.

Q        If you're standing in one place, you shift your weight from side to side but you're pretty much standing in one place, how long are you able to stand?

A        Not very long because I have to change feet.

Q        All right.  How long is not very long?

A        Seconds.  Not a minute.  Not 60 seconds where I stand in one place.

Q        Okay.  Well, even if you can change - - like shift your weight from - -

A        Oh, then - - I don't know.

Q        - - from foot to foot?

A        Probably - - I don't know.  I could probably stand around a half-hour.  It hurts.  I mean, I stood outside for probably 15, 20 minutes.  And it was - -

Q        So you can - -

A        - - starting to hurt so I went in - -

Q        All right.  You can - -

A        - - so I could sit down.

Q        - - stand a little longer than you can sit?

A        Yeah.  I'd have to say so.

Q        Okay.

A        I'd have to say yeah.

Q        All right.  Does walking cause you problems?

A        Yeah, it hurts now.  It's just awful.  I can't do that anymore.

Q        And how long usually are you able to walk or how far are you able to walk before you have to stop and rest?

A        I don't have to rest.  It just ties me up in my back and I have to stop or my legs just start to not - - they'll stop - - start to not work.  They start shaking.

Q        Okay.

A        That's the only way I can explain it.  They'll start - -

Q        How long does it take - -

A        - - muscle spasms.

Q        - - that you're walking before that happens?

A        Oh, I can go - - if I go to the grocery store with her and go up and down two aisles, I'm ready.  I'd like to have a cart to take me back to the car.

Q        Okay.  Now what about lifting?

A        I don't lift.  I'm afraid to.  I'm afraid because I've tried it before and hurt myself doing practically nothing before.  And I'm afraid.  I'm afraid to do it.

Q        All right.  Are you able to lift with your right hand?  You're right-handed, is that - -

A      Yes.

Q      - - correct?  Okay.  With your right hand, are you able to lift a gallon of milk?

A      Yes.

Q      And let's say carry it from your car to - - into your house?

A      Yes.  Don't stop and talk to anybody because my hand will go numb.

Q      All right.  So would you be able to hold that weight?

A      I wouldn't do that because I'd drop it.  I'd have to sit it down before I lost my feelings and dropped it.

Q      Now would you be able to do that with a bag of groceries, something a little heavier?

A      I can carry a bag of groceries.  I just don't want to.  It hurts.  And I've just quit.  I mean, it used to not bother me that it hurt.  Now it hurts to the point where it does.  I think it always hurt, I just don't think it hurt this bad.

Q      Now do you have any social activities?  Do you go to church, go out - -

A      No.

Q      - - to eat, go - -

A      No.

Q      - - to movies - -

A      No.

Q      - - things like that?

A      No.

Q      Do you have friends over?

A        No.  I don't even go visit my friends and watch the races anymore.  They don't want to - - you know.  They don't want to sit around watching a race or a football game and someone moving around all the time and they have to lay back on, you know - - yeah.  You don't - - I don't even want to be around people in that sense when I'm hurting.

Q        Do you have any hobbies?  Are you able to read or - -

A        I do read some, but that's getting harder too.  I can't see too good.

Q        Do you have any difficulty with reading?  What kind of things do you read?

A        Western books, any kind of book I can get a hold of.

Q        Are you able to - - do you have any problems with that?

A        Reading?

Q        Um-hum.

A        Yeah.  I just have to focus in and out, you know.  It's just typical - - everybody has it, I guess.

Q        Now you mentioned a couple of times that you get angry - -

A        Just - -

Q        - - or get frustrated.

A        It's just I can't do anything about it.  It hurts so bad there's nothing I can do.

Q        How does that come out?

A        You know, I can't even afford to go get illegal pain pills.

Q        Do you - -

A        But I wouldn't do that anyway, because I ain't big on pills.  And that's one of the reasons I try not to take a bunch of stuff.

Q    Now how does that generally come - - how does that affect your ability to, like, be around people, for instance?

A    I - - if I'm hurting real bad, I just get mad.  I mean, there's nothing else I can do.  I mean, you can't complain.  She's sick of hearing it.  I know I've told Robin 50 times you're not going to hear me complain any more.  And people can know - - they know you're uncomfortable and they can realize you're hurting and it's frustrating being around people.  I mean, I - - I don't know.  It would make me - - it makes me uncomfortable if somebody's hurting and I couldn't help them.

Q    If you had a physically easy job, you didn't have to lift a lot, and you could sit or stand when you wanted to, would you be able to do that - - a type of job like that eight hours a day, five days a week?

A    You mean if I felt like it?

Q    No.  Now, the way you feel.

A    No.  I wouldn't try it.  I - -

Q    Why - -

A    - - wouldn't commit to it.

Q    - - why not?

A    Because I know I won't do it.  I won't finish it.  I can't.  And I don't want to put myself in that position again, I've done it twice.

*          *          *

[EXAMINATION OF CLAIMANT BY ALJ]

Q    Did you lie down yesterday?

20

A       Did I?

Q       Yes.

A       Oh, yes.

Q       How long?

A       Maybe 15, 20 minutes at a time until I laid down for good about 3:00 this

morning and got up - - well, I tossed around and then I got up at 6:00.

*               *               *

Q       Is your - - are your nights and days mixed up possibly?  Is that - -

A       No.

Q       - - why you're only sleeping two hours at night?

A       No.

Q       It's just the pain is keeping you up - -

A       It don't matter - -

Q       - - 24/7?

A       - - when it is.  I mean, when I collapse it don't - - it could be at night, whenever

I'm so tired.  It might be at night.  I usually try to get to that point, but - -

Q       Is your most severe pain coming - - more severe pain coming from your neck or

back now?  Your neck had fusion by Dr. Weinstein 10 years ago.  But what is more troublesome

right now?  Or do you know?  Is it your back or your neck?

A       They both hurt awful bad.  But picking one or the other, I guess I'd have to say

the neck.  Because when it gets intense, it's a whole different story than my lower back.

*               *               *

A       Excuse me, sir?

Q       Any trips out of the region?

A       Sometimes I go to Weston, my hometown.

Q       That's what, an hour away?

A       Yes.  That's - -

Q       How often - -

A       - - not very - -

Q       - - have you been there in the last six weeks, since May 1?

A       Probably four or five times.  That's - -

Q       So about once every 10 days?

A       Probably on the average, yes.  Maybe.

Q       Do you drive?

A       Sometimes.  Whether I drive or not, it's not a very - - I don't like riding in the car anymore.

Q       Why do you go there so often?

A       Usually to borrow money off my sister or brother, to be quite honest with you.

Q       And then you just stay for the duration of asking them or do you stay for the day?

A       Sometimes when I go to my sister's I usually stay a while.  My brother and I, usually we say what we got to - - have to say, do it, and we're done.  But my sister, usually we stay.

                              *                 *                 *

Q       Do you go to church?

Q       A       Not anymore.

Q       Why not?

A       I don't know.  I just don't go.

Q       Do you cook?

A       Sometimes.  Depending - - sometimes.

Q       When was the last time you cooked that you remember?

A       Actually, I did try to cook last night.  I - -

Q       What'd you make?

A       I put spare ribs in a pan to boil and then I put them in a bake dish and poured barbecue sauce over them and baked them and burned them.

*               *               *

Q       Do you do any cleaning while Robin's working?

A       No.  She wishes I would.  Sometimes I'll try to.  You know, I'll do what I can when I feel like it.  I did drag our big garbage bag the other day across the parking lot, which was hilarious.

Q       Did it hurt your - -

A       Every body - -

Q       - - neck?

A       - - was laughing.  Excuse me?

Q       Did it hurt your neck?

A       No.  I walked backwards and pulled it.  It wasn't too bad.  Everyone was laughing.

        \*        \*        \*

ALJ        At this time I'll take the testimony of Mr. Tim Mahler, vocational expert. Sir, you've already been sworn in.  How would you describe Mr. Gibson's - - I believe I have Harrison County, Morgantown REM, the United Summit Center as essentially the same job. And then construction labor and then the more recent information about service miner.

CLMT      The support worker with the mentally retarded would be - - or the challenged would be medium semi-skilled work.  And the laborer - - coal - - construction worker is heavy semi-skilled.  give me a sec and I'll find the coal washer.  I wasn't aware of that one.

        \*        \*        \*

VE         The coal washer is described as light semi-skilled, but I'm sure he worked more than light work on the job.

CLMT      There's no light work there.  Honestly, sir.

ALJ        As performed by Mr. Gibson's - - based on his testimony, it was more medium to heavy, let's say.

VE         Medium to heavy, probably, Your Honor.

        \*        \*        \*

[EXAMINATION OF VE BY ALJ]

Q      Assume a younger - - oh, go ahead with the other - - did you describe - - what'd you say the ARC, REM, and United Summit Center was, just for the record?

A      Medium semi-skilled.

Q      Medium semi-skilled.

A      And - -

Q        Okay.

A        - - heavy semi-skilled for the construction - -

Q        Okay.

A        - - worker.

ALJ        Assume a younger individual with a high school education, one year of college, precluded from performing all but at best sedentary work with a sit/stand option - -

ATTY        What kind of work?

ALJ        Sedentary.  With a sit/stand option, no hazards.  Do you have a cane, Mr. Gibson?

CLMT        No.

ALJ        Okay.

CLMT        I just use my left leg kind of for - -

ALJ        Support?  No hazards, such as machinery and heights, only occasional posturals.  Mr. Gibson, you do take medications for breathing, right?

CLMT        Yes.

ALJ        Even though you're smoking.  And how's your high blood pressure?

CLMT        The last time it was checked it was staying up pretty high.

ALJ        Are they going to increase your medication at Health Right?

CLMT        They did.  It was 25 milligrams.  And I think, what, about two months ago they increased it?  Two or three months ago, maybe.  Not that long.

BY ADMINISTRATIVE LAW JUDGE:

Q        Okay.  A clean air environment, free of excessive dust, fumes, pollutants.  With

those limitations, sir, can you describe any work?

A       Yes, Your Honor.  Sedentary with those limitations I could offer a surveillance system monitor: 50 local, 15,000 nation.  There are also addressers - - where are they?  Okay. 250 local, 150,000 nation.  There are credit reference clerks: 300 local, 129,000 nation.  And there - -

Q       Are those - - go ahead.  Give me one more.

A       I was going to say information clerks: 200 local, 51,000 nation.

Q       Are those jobs consistent with the DOT?

A       The only inconsistency, Your Honor, is that the DOT does not include a sit/stand option in its definitions.  The reason I offer these jobs is based on my experience in placing disabled workers in jobs for the past 25 years and in working with various employers, I find that these types of jobs typically permit the worker to sit and stand while doing essential duties.

Q       What if the Claimant's pain that he described was so severe that he could not stay on task in a work environment one-third to two-thirds of the day?  Would those jobs be affected?

A       That would eliminate all the jobs, Your Honor.  You have to be on task and functioning at least 85 to 90 percent of the workday.

Q       Mr. Gibson stated he sleeps poorly and therefore I think part of the day he lies down.  If he even had to lie down one hour in the a.m. of a workday, and due to pain as well, but - - fatigue and pain, had to lie down one hour in the a.m. of a workday, even one hour in the p.m. of a typical workday, would those jobs also be ruled out?

A       They would, Your Honor.  You can't lie down at any time on these jobs except for the regular breaks.

26

Q        What's a tolerable number of absenteeism in those types of jobs?

A        One day a month is permissible, Your Honor.

ALJ    Okay.  Ms. Carpenter?

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        If a person had difficulty with bimanual dexterity, such as that they would be unable to use their hands on a repetitive basis throughout the day, limited to less than occasional use of the hands, how would that affect the ability to perform the jobs that you named?

A        That would eliminate all of the jobs with the exception of the surveillance system monitor.  The other jobs would require frequent use of the hands.

Q        And the surveillance system monitor position, is it a position that requires more on task time than most positions?  Does it even allow for the 10 to 15 percent that you described earlier?

A        You have to be able to be functioning and looking at a television screen or two or three.  You have to be able to pay attention - - like if you're sitting down and watching a movie or something on TV.  You have to have your consciousness on what's going on.

Q        Right.  It would seem to me that that is the job.

A        That is what you're doing.

Q        Concentration - -

A        You're sitting there - -

Q        - - is the job.

A        - - walking around, looking at the TV screens.  It's not a high level of concentration.  You can daydream while you're watching it, you know.  But you know, you have

to be able to see the screen.

*           *           *

E.       <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

- Prepares his own lunch (Tr. 87)

- Puts dishes in the dishwasher (Tr. 87)

- Runs errands (Tr. 87)

- Manages bank accounts (Tr. 87)

- Shops for food, clothing, books, magazines, medication, cigarettes, and newspapers (Tr. 88)

- Reads magazines, newspapers, and books (Tr. 88)

- Watches television (Tr. 88)

- Listens to records and tapes (Tr. 88)

- Visits relatives in Weston, W.V. approximately two times per month (Tr. 89, 269-69)

- Provides food and medication to his cats (Tr. 98)

- Drives a car (Tr. 100)

- Smokes a pack and a half of cigarettes per day (Tr. 240)

- Smokes marijuana (Tr. 240)

- Cooks meals periodically (Tr. 270)

### III. The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in conducting his credibility analysis of Claimant's testimony, and (2) in finding significant numbers of jobs exist that Claimant can perform.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered Claimant's credibility and correctly determined a significant number of jobs exist that Claimant can perform.

B.      The Standards.

1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

       8.     Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

       9.     Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. 20 C.F.R. §§ 404.1520, 416.920. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.       Discussion

I.

The ALJ's Credibility Analysis

The first issue concerns whether the ALJ committed error in his credibility analysis of

Claimant.  Claimant argues the ALJ erred in finding him not fully credible.  Commissioner

contends the ALJ's decision is supported by substantial evidence.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints

in Craig, 76 F.3d at 585.  Under Craig, when a claimant alleges disability from subjective

symptoms, he must first show the existence of a medically determinable impairment that could

cause the symptoms alleged.  Id. at 594.  The ALJ must "expressly consider" whether a claimant

has such an impairment.  Id. at 596.  If the claimant makes this showing, the ALJ must consider

all evidence, including the claimant's statements about his symptoms, in determining whether

the claimant is disabled.  Id. at 595.  While the ALJ must consider the claimant's statements, he

need not credit them to the extent they are inconsistent with the objective medical evidence or to

the extent the underlying objective medical impairment could not reasonably be expected to

cause the symptoms alleged.  Id.  However, subjective symptoms "may not be dismissed merely

because objective evidence of the pain itself . . . are not present to corroborate the existence of

pain."  Id.  As long as the ALJ followed the legal mandates of Craig, his factual determinations

will be upheld so long as they have substantial evidence to support them.  Milburn Colliery Co.,

138 F.3d at 528.  A decision with substantial evidence adequately explains its reasoning.  Id.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may

consider discrepancies between the severity of the complaints and the treatment sought.  In

Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994), the Fourth Circuit stated that "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility." Furthermore, "A claimant's allegations of disabling pain may be discredited by evidence that he or she has received minimal medical treatment and/or has taken medications, other than aspirin, for pain only on an occasional basis." Williams v. Bowen, 790 F.2d 713, 715 (8th Cir. 1986). Thus, it is appropriate "for the ALJ to consider the level and type of treatment the plaintiff sought and did or did not receive in determining what weight to accord" to subjective allegations. Baldwin v. Barnhart, 444 F. Supp. 2d 457, 464 (E.D.N.C. 2004).

The ALJ found Claimant has medically determinable impairments that could cause the pain he alleges. (Tr. 16). Nevertheless, the ALJ declined to fully credit Claimant's testimony. Id. The ALJ noted Claimant does not take medication for pain. Id. He also noted Claimant cooks, drives shops, and reads. Id. The ALJ credited Claimant's testimony to the extent of limiting him to sedentary work. Id.

The ALJ correctly followed the first Craig step by explicitly finding Claimant has medically determinable impairments that could cause the symptoms alleged. Id.; Craig, 76 F.3d at 596. Claimant has not challenged the ALJ's opinion at this step.

The Court believes substantial evidence supports the ALJ's decision to only partially credit Claimant's testimony and therefore the decision should be affirmed in this regard. First, the ALJ noted Claimant does not take pain medication. (Tr. 16). Although Claimant argues this should not be held against him because he cannot afford medication, Claimant testified his workers' compensation coverage will pay for some medicine. (Tr. 243). Yet "nothing helps it,

so I don't get the prescriptions." Id. Claimant has also refused to consider using a morphine pump to ease his pain. (Tr. 266-67). When asked why he was not open to the treatment, Claimant responded "I'm an old man. I'm done." (Tr. 267). He also stated he did not "like that idea of having something like that on me forever." Id. Claimant declined to consider this treatment even though he also testified he only gets about two hours sleep per night due to pain and does not even get those two hours at one time. (Tr. 254-55, 266-67). This evidence properly tends to undermine Claimant's credibility. Mickles, 29 F.3d at 930; Williams, 790 F.2d at 715.

The ALJ also considered that Claimant's activities of daily living undermine his subjective complaints. (Tr. 16). Craig provides the ALJ should consider such evidence in evaluating credibility. Craig, 76 F.3d at 595. The ALJ noted Claimant drives, cooks, shops, and reads. (Tr. 16). Claimant testified he travels to Weston, W.V. about every ten days and does the driving sometimes. (Tr. 269). He also testified he periodically cooks. (Tr. 270). Indeed, the night before the administrative hearing Claimant boiled ribs and poured barbecue sauce on them. Id. Claimant testified he reads "any kind of book I can get a hold of." (Tr. 261). Although he stated he had some difficulty in focusing on the pages, he also seemed to discount the limitation, stating that "everybody has it, I guess." Id. This evidence undermines Claimant's subjective allegations of disabling limitations. Craig, 76 F.3d at 595.

Even aside from this evidence, other evidence in the record supports the ALJ's decision to only partially credit Claimant's subjective symptoms. In August 2004, Dr. Biundo determined Claimant "is independent in all areas" and "is able to function independently." (Tr. 152). He also stated Claimant was "doing fairly well" with his sleep disorder. (Tr. 153). Dr. Weinstein wrote the best therapy was "vigorous and active physical therapy to try to get himself back into a

situation where he can do something." (Tr. 121).

Thus, substantial evidence supports the ALJ's decision to only partially credit Claimant's subjective complaints. The ALJ's decision should be affirmed in this regard.

II.

<u>The ALJ's Determination That Substantial Numbers of Jobs Exist Claimant Can Perform</u>

Claimant next challenges the ALJ's determination that substantial numbers of jobs exist in the national economy Claimant can perform. Claimant notes that when he added limitations in dexterity to the hypothetical posed by the ALJ to the vocational expert (VE), the VE was only able to identify one position someone with those limitations could perform. The VE stated there were only fifty of those jobs available locally and 15,000 nationally. Claimant argues this is an insufficient number of jobs under the Regulations. Commissioner points out Claimant's hypothetical included limitations not ultimately accepted by the ALJ. Commissioner notes that when the VE responded to the ALJ's hypothetical, he pointed other jobs Claimant can perform. Thus, Commissioner urges the Court to affirm the ALJ.

The ALJ is not required to accept answers a VE gives to hypothetical questions when the hypothetical contains limitations not ultimately adopted by the ALJ. 20 C.F.R. § 404.1560(b)(2); <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir. 1986). The additional limitations regarding hand movements in Claimant's hypothetical to the VE were not ultimately adopted by the ALJ. (Tr. 18, 278). Claimant's argument that the VE only identified one position he can perform therefore depends on the ALJ's rejection of Claimant's hand limitations being in error. Therefore, the Court must consider whether the ALJ's rejection of this limitation has substantial evidence to support it. <u>Hays</u>, 907 F.2d at 1456.

The Court concludes the ALJ's decision to not credit Claimant's alleged limitations in dexterity has substantial evidence to support it and should therefore be affirmed. It has been noted Claimant has symptoms consistent with carpal tunnel syndrome in his right hand and also has a deformity of the fifth finger in the right hand. (Tr. 154). Yet it has also been stated Claimant has "excellent strength and sensation." Id. Claimant can fully extent his hand, make a fist, and oppose his fingers. (Tr. 155). He has normal upper extremity and grip strength. Id. A physical residual functional capacity assessment from September 2004 found Claimant to have no manipulative limitations. (Tr. 162). This included limitations in reaching, handling, fingering, and feeling. Id. Given that the substantial evidence standard is "satisfied there is a 'genuine dispute,'" that standard is met here. Pierce v. Underwood, 487 U.S. 552, 565 (1988).

Since the Court concludes substantial evidence supports the ALJ's decision not to include Claimant's alleged manipulative limitations in his hypothetical question to the VE, the Court will now examine whether the jobs identified by the VE represent a significant number of jobs. The statute applicable to the issue here provides that to avoid an award of benefits, Commissioner must show "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). In Hicks v. Califano, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), the Fourth Circuit stated (albeit in a footnote) that 110 regional jobs represents a significant number of jobs under the statute.

In this case, the VE identified the positions of surveillance system monitor, addresser, reference clerk, and information clerk as positions Claimant could perform. (Tr. 276-77). There were 345,000 of these jobs available nationally and 800 locally. This is clearly sufficient to satisfy Commissioner's burden of showing work exists for Claimant in significant numbers. 42

U.S.C. § 423(d)(2)(A); <u>Hicks</u>, 600 F.2d at 1051 n.2.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.    Claimant's Motion for Summary Judgment be DENIED.

2.     Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's credibility and analysis and his determination that work exists in significant numbers in the national economy that Claimant can perform.

Any party who appears <u>pro se</u> and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear <u>pro se</u>.

DATED: February 2, 2007

<u>/s/ James E. Seibert</u>
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE